# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**FILED**

MAR 1 9 2004

RALPH L. DeLOACH, Clerk
By _____ Deputy

DR. KARIN PAGEL MEINERS, PH.D.,

Plaintiff-Appellant,

v.

UNIVERSITY OF KANSAS,
CHANCELLOR ROBERT
HEMENWAY, in his official capacity,
and PROVOST DAVID
SHULENBURGER, in his official
capacity,

Defendants-Appellees.

No. 02-3376

01-2354-KHV

JUDGMENT

Filed February 24, 2004

Before **SEYMOUR**, **McKAY**, and **McCONNELL**, Circuit Judges.

This case originated in the District of Kansas and was argued by counsel.

The judgment of that court is affirmed.

A true copy
Teste
Patrick Fisher
Clerk, U. S. Court of
Appeals, Tenth Circuit

By _____
Deputy Clerk

Entered for the Court
PATRICK FISHER, Clerk

by: _____

Deputy Clerk

F I L E D
United States Court of Appeals
Tenth Circuit

FEB 24 2004

PATRICK FISHER
Clerk

<u>PUBLISH</u>

# UNITED STATES COURT OF APPEALS

## TENH CIRCUIT

---

DR. KARIN PAGEL MEINERS, PH.D.,

        Plaintiff-Appellant,

v.

UNIVERSITY OF KANSAS, CHANCELLOR ROBERT HEMENWAY, in his official capacity, and PROVOST DAVID SHULENBURGER, in his official capacity,

        Defendants-Appellees.

No. 02-3376

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS
### (D.C. NO. 01-CV-2354-KHV)

---

Alan V. Johnson, Sloan, Listrom, Eisenbarth, Sloan & Glassman, L.L.C. (Stephen D. Lanterman, Sloan, Listrom, Eisenbarth, Sloan & Glassman, L.L.C., with him on the brief); Topeka, Kansas, for Plaintiff-Appellant.

Barbara L. McCloud, Special Assistant Attorney General and Associate General Counsel, Univeristy of Kansas; Lawrence, Kansas, for Defendants-Appellees.

---

Before **SEYMOUR**, **McKAY**, and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

The plaintiff, Dr. Karin Pagel Meiners, Ph.D., appeals the district court's grant of summary judgment to the defendants on all her claims. Dr. Meiners sued her former employer, the University of Kansas, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging that she was denied tenure in retaliation for her filing of discrimination complaints. She also sued the University's Chancellor and Provost, in their official capacities, under 42 U.S.C. § 1983 for depriving her of property without due process. We have jurisdiction under 28 U.S.C. § 1291.

Dr. Meiners was a German literature professor at the University of Kansas who was denied tenure and terminated from her teaching job. During her tenure run, Dr. Meiners decided to work part-time during two different fall semesters so that she could attend to family obligations. Each time, the University responded by extending her probationary period by one year, thereby delaying the final tenure review by a total of two years. Although Dr. Meiners had notice of the extensions and did not object to them at the time, she now claims that extending her probation by two years violated her contract with the University. The University, she insists, was required to conduct its tenure review a year earlier than it did, and its failure to do so entitles her to tenure by default. When the University refused to grant her tenure by default, Dr. Meiners sued, claiming that

-2-

the University's refusal violated Title VII and § 1983. We find no merit to Dr. Meiners's claim of entitlement to tenure and accordingly **AFFIRM** the district court's judgment.

## I. Background

In February, 1992, Dr. Meiners received a job offer from the University of Kansas as a tenure-track assistant professor in the Department of Germanic Languages and Literature. The offer letter stated that the appointment was subject to annual renewal and that it might lead to review for permanent tenure. The letter "stipulated" that final tenure review would occur no later than Dr. Meiners's sixth year of full-time teaching at the University. Appellant's App. 48. The letter also stated that "[t]enure will accrue after 7 years of full-time teaching (or library service) unless notice to the contrary is provided in accordance with University and Board of Regents regulations." *Id.* Dr. Meiners signed the offer and began teaching at the University in August of 1992.

In March, 1994, Dr. Meiners requested part-time leave for the coming fall semester under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615, in order to care for her young child. University policy specifically allowed FMLA leave on a part-time basis and guaranteed that the employee would be returned to the same or equivalent position upon return.

Dr. Meiners received approval of her FMLA leave request from her department chair, Dr. William Keel, at the end of March, 1994. The leave consisted of a 40 percent reduced work schedule from August 22 to December 8, 1994. Dr. Meiners covered the majority of her time off by using 173.5 hours of paid sick leave that she had accumulated, but the remaining 62.9 hours were unpaid leave. Before the semester began, Dr. Meiners received her annual notice of continuing appointment for the 1994-95 academic year. Although Dr. Keel had already approved Dr. Meiners's request for a reduced appointment for fall semester, the notice indicated that the appointment was full-time and made no mention of the FMLA leave.

In February of 1995, after Dr. Meiners had returned to full-time duties, Dr. Keel wrote a letter to Defendant David Shulenburger, who was then Vice-Chancellor for Academic Affairs, informing him that he had permitted Dr. Meiners to reduce her appointment to 60 percent of full-time during the fall semester. Mr. Shulenburger then wrote a letter to Dr. Meiners stating that, due to her reduced appointment, the date of her mandatory tenure review had been moved back by one year. The letter also pointed out that part-time service did not count toward the probationary period. Mr. Shulenburger's letter specifically advised Dr. Meiners that her tenure review would take place no later than the 1998-1999 academic year.

-4-

During the academic year of 1995-1996, the Tenure Committee of Dr. Meiners's department conducted a pre-tenure review to assess her probability of achieving promotion and tenure.  The committee concluded that Dr. Meiners's record of teaching and service was satisfactory, but her research productivity was inadequate.  The review advised Dr. Meiners that she would be unlikely to receive promotion and tenure unless she published some of her research.

In March, 1997, Dr. Meiners requested another 40 percent reduced appointment for fall semester of 1997 due to the death of her husband.  In her request, she wrote, "It is also my understanding that taking this reduction will automatically postpone the mandatory tenure review by one year."  Appellant's App. 55.  Provost Shulenburger approved this request.  His approval letter again advised Dr. Meiners that her reduced appointment would extend the tenure clock by one year because, under University regulations, part-time service did not count toward the probationary period.  The letter stated that the mandatory tenure review would occur no later than the 1999-2000 academic year.

The University considered Dr. Meiners for tenure and promotion to associate professor during the 1999-2000 academic year, as promised.  The University decided not to grant tenure.  In March, 2000, Dr. Meiners received a notice of non-reappointment and a terminal contract for the subsequent academic year.

In September, 2000, Dr. Meiners filed a complaint against the University
with the Kansas Human Rights Commission ("KHRC").  Dr. Meiners alleged
before the KHRC that she had been discriminated against continuously since she
began working for the University in 1992.  The KHRC dismissed the complaint on
January 31, 2001.

Because Dr. Meiners was denied tenure, she was, beginning in the fall of
2000, no longer eligible for graduate faculty status.  However, it came to the
attention of Dr. Keel that a graduate student had already enrolled to do graduate
work under Dr. Meiners's supervision.  Dr. Keel therefore requested that Dr.
Meiners's graduate faculty status be continued for the fall semester of 2000.  The
University approved the request in October.  In December, the Provost informed
Dr. Meiners that, if she wished to retain graduate faculty status past the fall
semester, the request must originate with her department.  Dr. Meiners then asked
Dr. Keel for an additional extension of her graduate faculty status, and he agreed
to present her request to the Department's tenure committee.  The committee
unanimously decided not to endorse the request, and Dr. Meiners was so informed
on January 19, 2001.

On February 6, 2001, Dr. Meiners filed a complaint against the University
with the Equal Employment Opportunity Commission.  The EEOC complaint
alleged that the University had denied tenure to Dr. Meiners on account of her sex

and her opposition to the University's discriminatory practices.  Dr. Meiners
further alleged that the University's mishandling of her tenure application, failure
properly to handle her appeal of the tenure denial, alteration of terms of her
employment, revocation of her graduate faculty status, and refusal to accept her
medical leave request were all elements of a pattern of discrimination and
retaliation against her by the University.  The EEOC found no violations of any
non-discrimination statute by the University and dismissed the complaint in April,
2001.

On May 4, Dr. Meiners wrote a letter to the Provost in which she claimed,
for the first time, that she was entitled to tenure by default.  In the letter, Dr.
Meiners confirmed that she had twice taken a 60 percent appointment for the fall
semester, but that the corresponding extension of her probationary period by two
years was an error:

> In my third year (1994-1995), I was granted a reduced appointment
> (60%) as maternity leave for the Fall Semester under the federally
> mandated Family and Medical Leave Act.  This reduced appointment
> stopped the tenure clock for one year . . . . [T]he Fall Semester 1997
> was granted under a similar arrangement as the maternity leave
> (reduced appointment at 60%).  This stopped the tenure clock for
> another year and moved the tenure review to the Fall Semester 1999.
> One is, of course, happy for as much time as possible before the
> review, but this second exten[s]ion appears to be an administrative
> error.

Appellant's App. 58.  Dr. Meiners then pointed out that she had returned to full-
time work in both of the spring semesters following her reduced appointments.

-7-

> [Y]ou appear to be complaining that your mandatory date for tenure review was extended by two full years (academic years 1994-1995 and 1997-1998), though you were on reduced appointments for only one semester in each of those years. The University has an annual schedule for promotion and tenure review. In order for your review to be conducted within the designated cycle, the adjusted date for your mandatory review reflected a full year in response to your initial request.

Appellant's App. 62. As for the second leave, the Provost's letter explained that "[i]t is unusual for the University of Kansas to postpone mandatory promotion and tenure review for more than one year. We did so in your case because the circumstances that led to your second request were so compelling." *Id.* Finally, the Provost enclosed a report prepared by his assistant regarding the 1973 newspaper article and concluded that "there is no similarity between your circumstances and those that obtained in 1973." *Id.* at 63.

Dr. Meiners's terminal contract expired on May 19, 2001, and the University terminated her employment on that date. She filed this lawsuit on July 20, 2001. The complaint alleged that the defendants, in violation of Title VII, retaliated against Dr. Meiners for her filing of discrimination complaints by refusing to approve her request for graduate faculty status and by rejecting her claim to tenure by default. The complaint also included a claim against University of Kansas Chancellor Robert Hemenway and Provost Shulenburger under 42 U.S.C. § 1983 for depriving Dr. Meiners of her property interest in continued employment with the University without due process of law.

The defendants moved for summary judgment. On September 16, 2002, the district court issued a 41-page published opinion granting summary judgment to the defendants on all claims. *Meiners v. Univ. of Kansas*, 239 F. Supp. 2d 1175 (D. Kan. 2002). The district court analyzed the two retaliation claims according to the *McDonnell Douglas* burden-shifting framework. *Id.* at 1190 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)). The district court granted summary judgment on the first retaliation claim (denial of graduate faculty status) on the ground that removal from graduate faculty status was a normal incident of the denial of tenure and therefore the removal did not constitute an "adverse employment action," which is an essential element of the plaintiff's prima facie case. *Id.* at 1191. The court granted summary judgment on Dr. Meiners's other retaliation claim (denial of default tenure) on two independent grounds. First, the district court determined that Dr. Meiners failed to establish a prima facie case because she did not provide sufficient evidence of a causal connection between her filing of complaints and the denial of default tenure. *Id.* at 1194. Second, even if there were enough evidence of a causal connection to sustain a prima facie case, the University proffered a legitimate, nondiscriminatory reason for its actions, namely, its belief that Dr. Meiners had not earned tenure, which Dr. Meiners could not show was pretextual. *Id.* at 1197.

The district court also granted summary judgment on Dr. Meiners's due process claim.  The court reasoned that Dr. Meiners could only prevail on this claim if she could show that she had a legitimate expectation of continued employment at the University, and that she could only have such an expectation if she was legally entitled to default tenure under her appointment contract and the University regulations incorporated therein.  *Id.* at 1198-99.  The court determined that Dr. Meiners was not entitled to tenure because she had not completed seven years of full-time teaching as required by the express terms of the contract.  Moreover, even assuming the contractual term "year of full-time teaching" was ambiguous, as Dr. Meiners insisted, the court determined that the parties' conduct, as evidenced by the letters to Dr. Meiners extending her probationary period and her tacit acceptance of those extensions, showed that the parties interpreted the term as meaning an entire academic year of full-time teaching.  Therefore, Dr. Meiners had not earned tenure by May of 2000, and her termination the following month was not a denial of due process.

Dr. Meiners timely appealed the district court's judgment.  She argues on appeal that the district court should not have granted summary judgment on any of her three claims.  We review *de novo* the district court's grant of summary judgment, considering the evidence in the light most favorable to the appellant. *Wilson v. Meeks*, 98 F.3d 1247, 1252-53 (10th Cir. 1996).

-11-

## II.  Title VII Retaliation Claims

Dr. Meiners claims that the University discriminated against her in retaliation for her filing of claims before the KHRC and the EEOC.  This cause of action arises from 42 U.S.C. § 2000e-3(a):

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Under the *McDonnell Douglas* burden-shifting framework, the plaintiff must first establish a prima facie case by showing that (1) she engaged in protected opposition to Title VII discrimination; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action.  *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001).  Once the plaintiff makes a prima facie showing, the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action.  The plaintiff must then respond by demonstrating that the employer's asserted reasons for the adverse action are pretextual.  *Id.*

### A.  Graduate Faculty Status

Dr. Meiners claims that Dr. Keel's refusal to endorse her January, 2001 request for an extension of her graduate faculty status for the spring semester of 2001 was an act of retaliation for her filing of discrimination claims.  The district

-12-

court granted summary judgment on this claim on the ground that Dr. Meiners failed to establish that the denial of graduate faculty status was an adverse employment action.

To be an adverse action, the employer's conduct must be "materially adverse" to the employee's job status. *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir. 1998). The adverse action must amount to "a significant change in employment status," such as "firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Aquilino v. Univ. of Kansas*, 268 F.3d 930, 934 (10th Cir. 2001) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

In *Aquilino*, this Court held that a university's refusal to allow a faculty member who had been denied tenure to be on a graduate student's dissertation committee or to serve on the graduate faculty was not an adverse employment action. 268 F.3d at 934-35. The Court reasoned that removal of a faculty member's responsibilities with respect to graduate students was not an independently adverse action but rather a "normal incident of the denial of tenure." *Id.* at 934. The plaintiff claimed that the university's action was adverse because it would injure her future employment prospects, but the Court determined that, "[g]iven Dr. Aquilino's tenure situation, her removal from the

-13-

committee had, at best, a de minimis effect on her future employment opportunities." *Id.*

Dr. Meiners claims that *Aquilino* is distinguishable because she has alleged a different harm, namely, the loss of eligibility for faculty travel grants. However, alleging a different sort of injury does not affect the applicability of *Aquilino*. The rule of *Aquilino* is that, where the employee does not challenge the underlying denial of tenure, the university's actions that are natural consequences of the denial of tenure do not constitute independent "adverse actions," even if they might be harmful to the employee's interests. In such cases, the true cause of the harm to the employee, whether the harm is damage to future employment prospects or ineligibility for grants, is the denial of tenure and not the consequent removal from the graduate faculty.[1]  Dr. Meiners does not dispute the district court's conclusion that, after the tenure denial, she was no longer eligible for membership on the graduate faculty. *Meiners*, 239 F. Supp. 2d at 1184.  Her loss of graduate faculty status was therefore a normal consequence of the denial of tenure, and under *Aquilino*, this does not amount to an adverse action.

### B. Denial of Default Tenure

---

[1]This is particularly evident in this case, because the reason Dr. Keel gave to Dr. Meiners for not endorsing her request for travel support was *not* her lack of graduate faculty status.  Rather, she was ineligible for the grant because "faculty not tenured or on tenure-track appointments are not eligible for travel support." Appellant's App. 117.  Thus, ineligibility for travel grants was, itself, a normal consequence of the denial of tenure.

Dr. Meiners claims that the University's refusal to accept her claim of entitlement to default tenure was in retaliation for her filing of discrimination charges. The district court determined that the denial of default tenure was an adverse employment action independent of the denial of merit-based tenure (which Dr. Meiners does not contest), despite the fact that Dr. Meiners was no worse off after the denial than she was before the denial. *Meiners*, 239 F. Supp. 2d at 1192-93. The University does not challenge this finding on appeal. Both parties therefore agree that Dr. Meiners has established the first two elements of the required prima facie case.

The final element of the prima facie case is a causal connection between Dr. Meiners's protected conduct and the denial of her default tenure request. Dr. Meiners argues that the close temporal proximity between her filing of discrimination actions and the University's rejection of her tenure claim supports an inference of causal connection. We have held that "unless the [adverse action] is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond mere temporal proximity to establish causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (emphasis in original). A six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient. *Id.*

Dr. Meiners filed her EEOC complaint on February 6, 2001. Three and a half months passed before the University denied her default tenure claim, on May 18, 2001. Dr. Meiners attempts to shorten this time period by arguing that the relevant starting point is not the date of her protected activity (i.e. the day she filed the EEOC charge) but rather the date that the retaliating officials at the University became aware of her charge. But this argument only helps Dr. Meiners's case at the margins. The EEOC sent a Notice of Charge of Discrimination to the University on February 23, which required a response by the University by March 7. Provost Shulenberger testified that, although he could not remember when he first became aware of Dr. Meiners's case, it was likely that he was consulted about the University's response. Thus, it seems likely that he found out about the discrimination filing sometime between February 23 and March 7. Therefore, the elapsed time between his awareness of the protected conduct and the adverse action was a minimum of about two months and one week and a maximum of just under three months. These events are, under our precedents, probably too far apart for Dr. Meiners to establish causation by temporal proximity alone.

Moreover, any inference as to retaliatory motive raised by temporal proximity is undermined by the fact that the May 18 tenure denial occurred only two weeks after Dr. Meiners's May 4 letter requesting default tenure. Temporal

proximity is much less suspicious when the adverse action is the denial of an affirmative request the plaintiff made subsequent to the protected activity. *See Kelley v. Goodyear Tire and Rubber Co.*, 220 F.3d 1174, 1179 (10th Cir. 2000) (holding that close temporal proximity is less likely to support an inference of retaliation in failure-to-hire cases because "employers naturally make hiring decisions soon after receiving applications"). Dr. Meiners must therefore provide evidence other than temporal proximity to establish a prima facie case.

Dr. Meiners points to two additional facts that she claims establish a causal connection. First, she claims that she can establish a causal connection by demonstrating a "pattern" of retaliatory conduct that began soon after the protected activity and culminated finally in the denial of default tenure. *See Marx v. Schnuck Mkts. Inc.*, 76 F.3d 324, 329 (10th Cir. 1996) (holding that the close temporal proximity requirement should not be read too restrictively where a pattern of discrimination begins soon after protected activity and only culminates later in actual discharge). Here, the alleged "pattern" consists only of the denial of graduate faculty status and the denial of default tenure itself. Two instances, one of which is not even an independently adverse action, that occur four months apart do not constitute a particularly impressive "pattern of retaliatory conduct." In addition, the pattern did not begin soon after Dr. Meiners engaged in protected activity, as almost four months elapsed between the filing of the KHRC complaint

and the denial of graduate faculty status.  This so-called "pattern" therefore does not support an inference of a causal connection.

Finally, Dr. Meiners claims that the University's denial of default tenure violated its own policies or practices, and that this suggests a causal connection between the denial and her protected activity.  As evidence of the University's policy on default tenure, Dr. Meiners refers to the incident from 1973, when the University granted tenure to certain faculty members who had been hired under a 5-year probationary period and were not given timely notice and tenure reviews because the University switched to a 7-year period.  However, as the district court pointed out, this 30-year-old incident does not support any inferences about the motives of the University in Dr. Meiners's case:

> For obvious reasons, plaintiff is not similarly situated to any of these faculty members; the University did not lengthen the tenure track or otherwise change the tenure rules in any relevant respect during plaintiff's probationary period.  Furthermore, the University's treatment of [them] reveals no unwritten policy or practice on the relevant issue in this case: whether less than full time teaching for one semester should extend the probationary period for one academic year or merely for one semester.  Plaintiff cannot seriously contend that the University has an unwritten policy or practice of granting tenure by default in all cases which involve disputed probationary periods.

*Meiners*, 239 F. Supp. 2d at 1194.  Thus, the events of 1973 do not establish a causal connection between the denial of default tenure and Dr. Meiners's discrimination complaints.  Dr. Meiners therefore failed to establish a prima facie

case, and the district court properly granted summary judgment to the defendants on this claim.[2]

### III.  Due Process Claim

Dr. Meiners's final claim is a § 1983 action against Chancellor Hemenway and Provost Shulenburger, in their official capacities.  Dr. Meiners asserts that the two officials deprived her of her property interest in her tenured position at the University without due process.  Before the district court, Dr. Meiners sought remedies of back pay, monetary damages, declaratory relief, and an injunction ordering her reinstatement as a tenured faculty member.  As the district court correctly held, the claims for back pay, monetary damages, and retrospective declaratory relief are barred by the Eleventh Amendment.  *Meiners*, 239 F. Supp. 2d at 1197-98.  However, as the district court noted, the Eleventh Amendment does not prohibit a suit in federal court to enjoin prospectively a state official from violating federal law.  *Id.* (citing *Ex parte Young*, 209 U.S. 123, 159-60 (1908)).  Reinstatement of employment is a form of prospective equitable relief that is within the doctrine of *Ex parte Young*.  *Doe v. Lawrence Livermore Nat. Lab.*, 131 F.3d 836, 839-41 (9th Cir. 1997); *Elliott v. Hinds*, 786 F.2d 298, 302

---

[2]Because we affirm the district court's determination that Dr. Meiners failed to establish a prima facie case, we need not consider its alternative holding that the University offered a legitimate non-discriminatory reason for its actions, which Dr. Meiners could not show was pretextual.

(7th Cir. 1986). Therefore, Dr. Meiners's claim under § 1983 for reinstatement is not barred by the Eleventh Amendment, and we consider it on the merits.[3]

In order to prevail on her procedural due process claim, Dr. Meiners must show that she possessed a protected property interest in continued employment at the University. *Hatfield v. Bd. of County Comm'rs*, 52 F.3d 858, 862-63 (10th Cir. 1995). The district court determined that, under Kansas law, Dr. Meiners could not have had a protected property interest in continued employment at the University unless she was entitled to tenure. *Meiners*, 239 F. Supp. 2d at 1198-99. The parties also agree on this point. The key question, then, is whether Dr. Meiners was, as a matter of Kansas contract law, legally entitled to tenure under her appointment contract.

The source of Dr. Meiners's claim of entitlement to tenure is a clause from the Notice of Employment she signed in 1992 stating that tenure would accrue "after 7 years of full-time teaching" unless the University gave notice to the contrary according to University regulations. Appellant's App. 48. Those regulations require notice of denial of tenure 12 months in advance of the

---

[3]In addition to their Eleventh Amendment immunity claims, the defendants claim they are entitled to the protections of qualified immunity. Qualified immunity applies to claims for monetary relief against officials in their individual capacities, but it is not a defense against claims for injunctive relief against officials in their official capacities. *Frank v. Relin*, 1 F.3d 1317, 1327 (2d Cir. 1993) (citing *Hafer v. Melo*, 502 U.S. 21, 22-23 (1991)). Because Dr. Meiners sued the defendants only in their official capacities and only her reinstatement claim survives the Eleventh Amendment bar, qualified immunity is inapplicable.

expiration of the probationary period.  Dr. Meiners claims that she completed seven years of full-time teaching in May, 2000, and that because she was not given notice of tenure denial until March, 2000, she had earned tenure under the terms of her appointment.  By the University's count, however, Dr. Meiners did not complete seven years of full-time teaching until May of 2001, because the University did not count the two academic years in which Dr. Meiners took a reduced appointment in the fall semester as counting toward the probationary period.  Thus, as the district court noted, "[t]he crux of the disagreement is what constitutes seven years of full time teaching under plaintiff's appointment contract."  *Meiners*, 239 F. Supp. 2d at 1199.

The University's interpretation is that a professor must teach full-time for a complete academic year in order for that year to count as a "year of full-time teaching" under the contract.  Under this reading, if a professor teaches part-time during fall semester and full-time during the spring, that entire academic year is treated as part-time teaching.  The district court found the University's interpretation persuasive because the appointment contract expressly specifies that its duration is for the nine-month academic year of 1992-1993.  *Id*. at 1200-01.  Since the appointment contract defines its duration in terms of a complete academic year, it is reasonable to interpret the contract's reference to a "year" of full-time teaching as also meaning a complete academic year.  The district court

-21-

also found that the conduct and statements of Dr. Meiners and of the University showed that, at the time of the leave requests, both parties understood that working part time for one semester would delay the probationary period by a full year. The court therefore concluded as a matter of law that "the parties intended for tenure to be calculated on an annual basis and not, as plaintiff claims, on a semester-by-semester basis." *Id*. at 1202.

Dr. Meiners offers two alternative theories for why the district court was wrong to count both the 1994-95 and the 1997-98 academic years as part-time under the contract. First, she asserts that her first reduced appointment was not part-time service because she remained on full-time status. Alternatively, Dr. Meiners contends that the contract required the University to aggregate the two full-time spring semesters she worked following each of her part-time semesters and to consider them together as an additional year of full-time teaching.

Dr. Meiners apparently concedes that she requested and received a 40% reduction in her work responsibilities for the fall semester of 1994, but she insists that her leave was formally structured in such a way that she remained technically on full-time status. Although she points to several pieces of evidence to support this claim, we ultimately agree with the district court's conclusion that the 1994-95 academic year was not a "year of full-time teaching" under the terms of Dr. Meiners's appointment.

-22-

First, Dr. Meiners relies on the fact that her annual notice of appointment for the 1994-1995 academic year contained a "1.00 FTE" notation, which indicated that the appointment was for one "full-time equivalent." However, the record shows that Dr. Keel approved Dr. Meiners's leave request without prior approval from the Provost's office, which issued the annual notice of appointment without knowing that Dr. Meiners had been approved for a 40% reduction for the fall semester. When Dr. Keel notified the Provost's office the following spring about the reduction, the University promptly sent Dr. Meiners a letter informing her that her tenure review date had been moved back a year because part-time service did not count toward the probationary period. Dr. Meiners did not object to the University's characterization of her fall semester service as part-time. Although the University did not issue an amended Notice of Appointment to reflect the 40% reduction, it was not necessary for them to do so since everyone seemed to agree on the part-time characterization. An employee who requests to work part-time, is permitted to do so, and does not object to written communication from the employer confirming part-time status cannot claim that she in fact was on full-time status simply because no one thought to amend the "1.00 FTE" notation in the original notice.

Second, Dr. Meiners claims that because she was able to cover most of her reduced appointment with paid sick leave, she remained a full-time employee.

She relies for this claim on deposition testimony from Provost Shulenburger, who
testified that a faculty member who had to take a month of paid sick leave during
a semester would continue to be on full-time status. Appellant's App. 78.  Provost
Shulenburger's testimony, however, does not establish that Dr. Meiners continued
on full-time status in the fall of 1994.  Although he agreed that a month of paid
sick leave could constitute "full-time service," he went on to distinguish such
temporary absences from situations, such as Dr. Meiners's, where a faculty
member is actually relieved of her responsibilities:

> I think you've got lots of variations in sick leave.  The general
> situation is that somebody temporarily fills in for a person and if
> temporarily filled in for and they come back to it after sick leave, then
> there's no break in service.  If a person were sick for such a long
> period of time that they said I can't continue my duties and asked to
> be relieved of their duties, I think we probably would not count that
> period as full-time service [be]cause they really weren't serving the
> university during the period, and that's . . . generally what happens in
> family medical leave.

Appellant's App. 78.   Moreover, Provost Shulenburger's testimony was in
reference to paid sick leave, but more than a third of Dr. Meiners's leave was
unpaid.  Finally, Chancellor Hemenway, in his own deposition, stated that full-
time status requires actually working at the one hundred percent level:   "Full-
time employment is . . . when your work totals up to one FTE . . . mean[ing] that
you're employed one hundred percent of your working time at the university."
Appellant's App. 69B.  Dr. Meiners's work was reduced by 40 percent, and she

was paid less than her full-time salary. In this context, Provost Shulenburger's testimony does not support the conclusion that, under the terms of the contract, the fall semester of 1994 should have been counted as "full-time teaching."

Finally, Dr. Meiners also contends that Dr. Keel's deposition testimony supports her claim to full-time status. Dr. Keel testified that, in the spring of 1993, Dr. Meiners discussed her request for FMLA leave for the coming fall and indicated her preference to remain on one hundred percent salary. Dr. Keel said that he and Dr. Meiners "worked out a mechanism" whereby she could reduce her appointment by 40% and "not lose a penny of her salary." Appellant's App. 71. However, Dr. Keel's subsequent testimony clarifies that this particular "mechanism" was one among a number of different options for structuring the leave that Dr. Meiners was considering. *Id.* at 71-72. Since it is undisputed that she did *not* remain on one hundred percent salary, it seems that some structure other than the one Dr. Keel referred to was ultimately decided on. Dr. Keel's testimony therefore has no bearing on whether the leave, as it was actually structured, required the University to count it as "full-time" service.

Most of this evidence goes to the amount that Dr. Meiners was paid, rather than the amount of work she performed. In determining whether a year of service should count toward the tenure probationary period, it seems that the relevant inquiry would involve whether the professor actually worked "full-time" rather

-25-

than whether she was paid as if she had. No one disputes that Dr. Meiners's actual work responsibilities were reduced to 60 percent. Even if salary is the applicable yardstick, Dr. Meiners still fell short of full-time because part of her leave was unpaid. The fall semester of 1994 was not "full-time teaching" under the contract and therefore did not count toward the probationary period.

Dr. Meiners's alternative theory is that the contract required the University to count the two full-time spring semesters following her part-time leaves as together constituting a year of full-time teaching. In support of this theory, she points to a letter from the Associate Secretary of the AAUP that she enclosed with her original request for default tenure. In that letter, the Associate Secretary opined that it would be reasonable for the University to add together the two spring semesters. Dr. Meiners also relies on an affidavit from Dr. Elmer Hoyer, a past President of the AAUP Kansas Chapter, in which Dr. Hoyer similarly opines that "full-time service" should be calculated on a semester-by-semester basis.

This kind of extrinsic evidence can only bolster Dr. Meiners's case if the contract term "year of full-time teaching" is ambiguous. *First Nat'l Bank of Olathe v. Clark*, 602 P.2d 1299, 1303 (Kan. 1979). However, even assuming that the contract is ambiguous and that a resort to extrinsic evidence is proper, we agree with the district court that Dr. Meiners's third-party evidence does not raise a genuine issue of material fact in light of the overwhelming evidence showing

-26-

that the parties themselves intended that a "year of full-time teaching" would be counted on an academic year basis. *See id.* at 1304 ("If the parties have by their conduct placed an interpretation on an ambiguous contract, it will be followed by the court.").

As Provost Shulenberger pointed out in his letter denying default tenure, the University has an annual schedule for tenure review and promotion decisions. Assessing a professor for tenure and promotion necessarily involves a series of procedures. In order for each professor's review to be conducted within the annual, scheduled cycle of such procedures, it makes sense for the University to consider each academic year of the probationary period on an all-or-nothing basis, as either completely full-time or completely part-time.

In addition, the communications between Dr. Meiners and the University show that everyone understood that taking part-time leave during one semester would result in extending the probationary period by an entire year. "If parties to a contract, subsequent to its execution, have shown by their conduct that they have placed a common interpretation on the contract, this interpretation will be given great weight." *City of Wichita v. Southwestern Bell Tel. Co.*, 24 F.3d 1282, 1287 (10th Cir. 1994). The University notified Dr. Meiners after both part-time semesters that it would extend her probationary period by a year. Both notices also specifically identified the year in which tenure review would take place. Dr.

Meiners did not object on either occasion.  She never gave any hint that her
probationary period should be counted on a semester by semester basis until more
than a year after she was denied tenure.  Moreoever, when Dr. Meiners requested,
in writing, the second part-time leave, she plainly confirmed her understanding
that taking this leave would extend the tenure clock by an entire year, even
though she would work full-time during the spring: "It is also my understanding
that taking this reduction will automatically postpone the mandatory tenure review
by one year."  Appellant's App. 55.  These communications make it clear that, in
the eyes of both parties, part-time leave during one semester would extend the
probationary period by an entire year.

Finally, we think it is worth mentioning that the extensions of Dr.
Meiners's probationary period were actually beneficial to her at the time they
were made.  The contemporaneous communications between Dr. Meiners and the
University show that University officials granted Dr. Meiners's part-time requests
and consequent extensions of the tenure clock in an effort to accommodate a
young professor struggling to produce a record of scholarly research worthy of
tenure while raising a child and coping with the tragedy of her husband's death.
Dr. Meiners admitted as much in her letter requesting default tenure when she
wrote, "One is, of course, happy for as much time as possible before the review."
Appellant's App. 58.  There are, no doubt, cases of tenure clock extensions that

-28-

are not beneficial, but rather reflect attempts by the University to retain an assistant professor's services without granting her tenure by stringing her along with promises of a tenure review that somehow keeps getting postponed. But this is not such a case. We are reluctant to adopt an interpretation of the University's contract and policies that would curtail its flexibility to accommodate the personal problems of its faculty and create an incentive to deny all requests for extensions of the probationary period.

For all of these reasons, we agree with the district court's ruling that Dr. Meiners was not entitled to default tenure in May, 2000. She therefore did not have a recognized property interest in continued employment, and her due process claim was properly dismissed.

## IV.

The district court's judgment granting summary judgment to the defendants on all claims is **AFFIRMED**.